# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### JASPER DIVISION

MAR -8 AM 8:39

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| HORACE DEAN GLISSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   NO. CV 00-JEO-0479-J |
| | ) |
| HOMES OF LEGEND, INC., and | ) |
| GRAND HOUSING, INC., | ) |
| | ) |
| Defendants. | ) |

ENTERED

MAR 0 2001

## MEMORANDUM OPINION

This matter is before the undersigned magistrate judge on the motion of the defendant, Grand Housing, Inc. ("the defendant" or "Grand Housing"), to dismiss this action or, in the alternative, to compel the plaintiff, Horace Dean Glisson ("the plaintiff"), to submit his various claims against Grand Housing to binding arbitration pursuant to the Federal Arbitration Act ("FAA") (doc. 6), the motion of Homes of Legend, Inc. ("Homes of Legend" or "Legend") to compel arbitration (doc. 9), Grand Housing's motion seeking to compel the disclosure of the settlement amount between the plaintiff and Homes of Legend (doc. 27), and the plaintiff's motion for a protective order preventing the disclosure of the settlement amount (doc. 28). For the reasons set forth herein, the court finds that Grand Housing's motion to compel to the extent it seeks dismissal of this action is due to be denied and to the extent it seeks to have this court to compel the plaintiff to participate in binding arbitration it is due to be granted; the motion of Legend to compel arbitration is moot; Grand Housing's motion seeking the disclosure of the settlement amount between the plaintiff and Legend is denied without prejudice; and, the plaintiff's motion for a protective order preventing the disclosure of the settlement amount is

*32*

moot.

## I. BACKGROUND

### A. History

The plaintiff filed a civil complaint on February 28, 2000, alleging that the defendants, Grand Housing and Homes of Legend, Inc., had each (1) breached express and implied warranties of merchantability, fitness, and to repair a manufactured home that Grand Housing had sold the plaintiff; (2) breached an implied warranty of habitability; (3) engaged in deceptive and/or misleading practices concerning the warranties; (4) engaged in bad faith; (5) denied him his right of recission; and, (6) negligently and/or wantonly constructed, inspected, and/or repaired the manufactured home purchased by the plaintiff.  The first two claims implicate the Magnuson-Moss Warranty Act ("MMWA" or "the Act").  *See* 15 U.S.C. § 2301, *et seq*.

The complaint alleges that the plaintiff negotiated for and purchased a 2000 model Homes of Legend home from Grand Housing for his daughter.  (Complaint, ¶¶ 9-10).  He financed the sale through Bombardier Capital, paying Grand Housing the full purchase price for the home.  (*Id.*, ¶¶ 13-14).  When the home was delivered to his daughter's property, she noticed that it was damaged.  She then "repeatedly informed the defendants of numerous defects" and further told them "that she did not want the home."  (*Id.*, ¶¶ 16, 18).  Thereafter, the defendants failed to correct the defects.  (*Id.*, ¶¶ 17, 18).  The complaint further alleges that the "home is not 'fit' in accordance with a reasonable expectation of reasonable consumers."  (*Id.*, ¶ 20).

On March 20, 2000, Grand Housing filed a motion to dismiss the complaint or to compel binding arbitration.  It alleges (1) there is no federal jurisdiction as to Grand Housing and the plaintiff; (2) the complaint fails to state the requisite amount in controversy; (3) Count One of the

complaint (breach of express and implied warranties) does not apply because Grand Housing is not the manufacturer of the home and because paragraph 10 of the sales contract contains an exclusion of any implied warranty of merchantability or fitness; (4) Count Two (breach of implied warranty of habitation) is not applicable as Grand Housing is not the manufacturer; (5) Count Three (deceptive practices with regard to the warranties) fails to state a claim; (6) Count Four (bad faith) fails to state a claim; (7) Count Five (denial of a right of recission) is deficient in that the plaintiff accepted the home as is; (8) Count Six (negligent or wanton construction or inspection) is deficient; and, (9) the plaintiff should be compelled to arbitrate his claims. (Doc. 6). Grand Housing also filed a brief in support of its motion. (Doc. 12). The plaintiff filed a memorandum in opposition to the motion. (Doc. 31). Grand Housing also filed a supplemental brief in support of the motion. (Doc. 24). Therein, it asserts that the MMWA does not apply to the defendant. (*Id.*, p. 1). The plaintiff filed a reply memorandum. (Doc. 25).

On March 24, 2000, defendant Homes of Legend filed a motion to stay the present case and to compel arbitration, citing the "Agreement for Binding Arbitration" and the "Manufactured Home Retail Installment Contract" signed by the plaintiff at the time of the sale of the home. (Doc. 9, Ex. A & B). Homes of Legend also cites the Limited One Year Service Warranty that was signed by the plaintiff shortly after the purchase of the home, which also includes an arbitration clause. (Doc. 9, Ex. C). The court has been informed that defendant Legend has settled this matter with the plaintiff. The terms of the settlement are apparently detailed in a confidential settlement agreement between the two parties. (Doc. 28, ¶ 1). This moots Legend's motion to compel arbitration.

**B. Factual History**

According to the affidavits submitted in support of the plaintiff's opposition, Linda Harten, the plaintiff's daughter, entered into an agreement with a representative of Grand Housing to purchase a manufactured home on October 11, 1999. (Doc. 15, Ex. B, ¶ 2). A salesman called Harten the next morning and informed her that she would need a co-signer on her loan. (*Id.*). She asked her father to co-sign. He agreed. Harten's husband and sister examined the home on the sales lot over the next couple of days. Harten wrote and provided Grand Housing with a post-dated check for $1,000 on October 13, 1999. Harten learned a short time later that she would not be getting the home that was on-site, but that one would be ordered from the manufacturer for her. (*Id.*). She attempted to stop payment on the check, but it had already cleared. (*Id.*).

On October 30, 1999, the plaintiff signed the paperwork, including the sales contract, a retail installment agreement and an agreement for binding arbitration. (Doc. 9, Ex. A, B, & D). He also signed a limited one year service warranty with Legend about two weeks later. (*Id.*, Ex. C). The sales contract and the installment agreement listed him as the buyer. (*Id.*, Ex. A & D). The agreement for binding arbitration and the one year warranty agreement similarly listed him as the contracting party. (*Id.*, Ex. B & C). Harten was not listed as the purchaser or owner on any of the documents.

The first two documents, the sales contract and the retail installment agreement, do not contain any terms and conditions regarding arbitration.[1]  The "Agreement for Binding

---

[1] The Sales Contract does include various clauses concerning warranties and limitations on damages. Specifically, it provides:

Arbitration," signed by a representative of Grand Housing and the plaintiff at the closing on

October 30, 1999, provides, in pertinent part:

> This agreement for binding arbitration is this date 10-30-99, entered between Horace O. Glisson, hereinafter called "Buyer", and Grand Housing Inc., a corporation, hereinafter called "Seller".
>
> Buyer has this date purchased from Seller a mobile home described as follows:
>
> Serial Number: H1-11898
>
> As part of the consideration for the sale of said mobile home, Buyer and Seller hereby enter into this agreement for binding arbitration, each intending to be mutually bound by the terms of this agreement.

---

> 10.   EXCLUSION OF WARRANTIES. I UNDERSTAND THAT THE IMPLIED WARRANTIES OF MERCHANT ABILITY AND FITNESS FOR A PARTICULAR PURPOSE AND ALL OTHER WARRANTIES EXPRESS OR IMPLIED ARE EXCLUDED BY YOU FROM THIS TRANSACTION AND SHALL NOT APPLY TO THE GOODS SOLD. I UNDERSTAND THAT YOU MAKE NO WARRANTIES WHATSOEVER REGARDING THE UNIT OR ANY APPLIANCE OR COMPONENT CONTAINED THEREIN, EXCEPT THAT AS MAY BE REQUIRED UNDER APPLICABLE STATE LAW.
>
> 11.   MANUFACTURERS WARRANTIES. I UNDERSTAND THAT THERE MAY BE WRITTEN WARRANTIES COVERING THE UNIT PURCHASED, OR ANY APPLIANCES OR COMPONENT(S), WHICH HAVE BEEN PROVIDED BY THE MANUFACTURER OF THE UNIT OR MANUFACTURER OF THE APPLIANCE(S) OR COMPONENTS. YOU WILL GIVE ME COPIES OF ANY AND ALL WRITTEN WARRANTIES SUPPLIED BY THE MANUFACTURERS, DELIVERY BY YOU TO ME OF THE WARRANTY BY THE MANUFACTURER OF THE UNIT PURCHASED, OR ANY APPLIANCE(S) OR COMPONENT(S) DOES NOT MEAN THAT YOU ADOPT THE WARRANTY(S) OF SUCH MANUFACTURER(S). I ACKNOWLEDGE THAT THESE EXPRESS WARRANTIES MADE BY THE MANUFACTURER(S) HAVE NOT BEEN MADE BY YOU EVEN IF THEY SAY YOU MADE THEM OR SAY YOU MADE SOME OTHER EXPRESS WARRANTY, YOU ARE NOT AN AGENT OF THE MANUFACTURER(S) FOR WARRANTY PURPOSES EVEN IF YOU COMPLETE, OR ATTEMPT TO COMPLETE REPAIRS FOR THE MANUFACTURER.
>
> 12.   LIMITATION OF DAMAGES. IF THE MANUFACTURER(S) WARRANTY IS LIMITED TO REPAIR OR REPLACEMENT AND SUCH WARRANTY FAILS BECAUSE OF ATTEMPT AT REPAIR ARE NOT COMPLETED WITHIN A REASONABLE TIME OR THE MANUFACTURER(S) HAS (HAVE) GONE OUT OF BUSINESS, I AGREE, THAT IF I AM ENTITLED TO ANY DAMAGES AT ALL AGAINST YOU, MY DAMAGES ARE LIMITED TO THE LESSER OF EITHER THE COST OF NEEDED REPAIRS OR REDUCTION IN THE MARKET VALUE OF THE UNIT CAUSED BY THE LACK OF REPAIRS. IN ANY CASE YOU WILL NOT BE REQUIRED TO PAY FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES. I ALSO AGREE THAT ONCE I HAVE ACCEPTED THE UNIT, EVEN THOUGH THE MANUFACTURER(S)' WARRANTY DOES NOT ACCOMPLISH ITS PURPOSE, THAT I CANNOT RETURN THE UNIT TO YOU AND SEEK A REFUND FOR ANY REASON.

(Doc. 9, Ex. D, p. 2, ¶¶ 10-12).

Buyer and Seller acknowledge that the said mobile home is a product manufactured and sold in interstate commerce and that the provisions of the Federal Arbitration Act are applicable to this contract. The parties further acknowledge that the sale of said mobile home is a transaction involving interstate commerce.

Buyer and Seller agree, covenant and consent, that any and all controversies or claims arising out of or in any way relating to the sale of said mobile home and the negotiations leading up to the sale, whether in the nature of covenant, warranty, misrepresentation, rescission, any breach of contract, or other tort, shall be settled solely by arbitration in accordance with the applicable Rules of the **Better Business Bureau** then in effect, and that judgement upon the award rendered by the arbitrators may be entered in and enforceable by any court of competent [sic] jurisdiction. Buyer and Seller further agree that they shall submit any and all disputes, controversies and cases arising out of the negotiations for and the sale and service of the mobile home, whether in the nature of contract, warranty, or tort, to the decision of a three-person arbitration panel. Buyer and Seller agree that they shall be bound by the determination of the said arbitration panel. The arbitration panel shall be appointed by the applicable national panel of arbitrators in accordance with the **Better Business Bureau's** rules for appointment of such panels. In accordance with the **Better Business Bureau**, the Buyer and Seller agree that any and all arbitration proceedings arising thereunder shall be held in the **county of sale, which is Jefferson County, Alabama.**

Buyer and Seller agree that this agreement shall cover any and all guarantees, claims or controversies between them, including but not limited to warranty claims, service or repair disputes, set-up or installation disputes, breach of contract, misrepresentations, claims, recission or revocation, loss of use, claims involving fitness for a particular purpose of merchantability, and all other claims arising out of or in any way related to the sale and service of the said mobile home.

It is further agreed by the parties that all rights, privileges and responsibilities under this agreement shall expressively inure to the benefit of the manufacturer of the said mobile home insofar as any claims may exist or hereafter arise against the manufacturer, including but not limited to, enforcement of warranties, whether expressed or implied. It is further acknowledged, agreed and stipulated to by the parties hereto that each of them acknowledges the benefit of including any and all claims which might be asserted against the said manufacturer in relations [sic] hereto in any arbitration proceeding contemplated hereby and, as such, each part shall, for purposes of judicial economy, decreased expense and justices expressly acquiesce in and be bound to settle such claims against the manufacturer by arbitration.

6

This agreement is part of the contract of sale entered into this date October 30, 1999, between Buyer and Seller, the terms and provisions of which are incorporated herein by reference, and shall be binding upon and inure to the benefit of their respective heirs and assigns.

(Doc. 9, Ex. B, pp. 1-2) (emphasis added). The "Limited One Year Service Warranty" between

Legend and the plaintiff, which was apparently signed by only the plaintiff on November 17,

1999, provides, in pertinent part:

LIMITATION OF REMEDIES: Any controversy, claim or dispute between or among the parties arising from or relating to the warranty, contract or any agreements or instruments relating hereto or delivered in connection herewith, or the breach thereof, and any claim based on or arising from an alleged tort, and if the controversy, claim or dispute cannot be settled through direct discussions or negotiations, the parties agree first to settle the dispute in an amicable manner by mediation administered by the **American Arbitration Association** under its Commercial Mediation Rules before resorting to arbitration. Thereafter, any unresolved controversy, claim or dispute arising from or relating to this contract, or breach thereof, and any claim based on or arising from an alleged tort, shall be settled by [a]rbitration [a]dministered by the **American Arbitration Association** in accordance with its Commercial Arbitration Rules and judgement on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. **All fees and expenses of the mediation-arbitration shall be borne by the parties equally. However, each party shall bear the expense of its own counsel, experts, witnesses, and preparation and presentation of proofs [sic].** This warranty, contract, or any agreements or instruments relating hereto or delivered in connection herewith between the parties shall be governed by the laws of the State of Alabama. All mediation or arbitration proceedings shall be conducted in **Albertville, Alabama, or at any other place selected by mutual agreement.**

(Doc. 9, Ex. C, p. 1)(emphasis added).

After the plaintiff signed the papers, Harten determined that he (the plaintiff) was the

only signatory on the loan, despite the fact that she had talked with the salesman about the

plaintiff being a co-signer. (Doc. 15, Ex. B, ¶ 3). When she learned how much the monthly

payments were going to be, she contacted Grand Housing and was promised that if she left the

payments at the amount specified in the loan agreement they would pay the first two payments. (*Id.*, ¶ 4). Harten immediately discovered numerous problems after the home was delivered. (*Id.*, ¶ 6). The home was not the same one that she had agreed to purchase at the Grand Housing sales location. When she refused to take possession of the home, the delivery people told her to contact Grand Housing. She did and a representative came to her residence. However, all the problems were not corrected. (*Id.*, ¶¶ 6-12).

## II. JURISDICTION

At the outset, Grand Housing asserts that this court is without jurisdiction in this matter. Specifically, it asserts that the plaintiff fails to allege a federal question involving the sale between him and Grand Housing and that it does not appear from the complaint that the requisite amount in controversy exists between the plaintiff and co-defendant Legend. (Doc. 6, ¶¶ 1-2).

The United States District Court for the Northern District of Alabama is a creation of Congress (U.S. Const., Art. III) and possesses only that portion of the constitutionally permissible field of Article III jurisdiction specifically granted by Congress. The contours of jurisdiction may not and must not be expanded by the court. *Synder v. Harris*, 394 U.S. 332, 342, 89 S. Ct. 1053, 1059, 22 L. Ed. 319 (1969). "[S]ubject matter jurisdiction is unwaiveable *sine qua non* for the exercise of federal judicial power." *E.R. Squibb & Sons v. Accidental and Cas. Ins. Company*, 160 F.3d 926, 929 (2nd Cir. 1998), *citing Curley v. Brignoli, Curley & Roberts Assocs.*, 915 F.2d 81, 83 (2nd Cir. 1990). Whether raised by the litigants or not, the federal court, including appellate courts, are duty bound to determine jurisdiction and dismiss any case in which it is found to be wanting. *See Eagerton v. Valuations, Inc.*, 698 F.2d 1115, 1118 (11th Cir. 1983). "As the Supreme Court has made it abundantly clear, it is one of the

8

fundamental tenants of our constitution that only some cases may be brought in federal court."

*E.R. Squibb*, 160 F.3d at 929, *citing Healy v. Ratta*, 292 U.S. 263, 270, 54 S. Ct. 700, 78 L. Ed.

1248 (1934).  Subject-matter jurisdiction can never be waived or conferred by the consent of the

parties.  *Insurance Corporation of Ireland v. Compagnie Des Bauxites de Guinee*, 456 U.S. 694,

702, 102 S. Ct. 2099, 2104, 72 L. Ed. 2d 492 (1982).

This court's jurisdiction in the present action may be premised on either of the plaintiff's

MMWA claims in counts one and two.  The pertinent portion of the Act provides:

> (d)(1) . . . [A] consumer who is damaged by the failure of a supplier,
> warrantor, or service contractor to comply with any obligation under this chapter,
> or under a written warranty, implied warranty, or service contract, may bring suit
> for damages and other legal and equitable relief–
>
> (A) in any court of competent jurisdiction in any State or the District of
> Columbia; or
>
> (B) in an appropriate district court of the United States, subject to
> paragraph (3) of this subsection.
>
> . . . .
>
> (3) No claim shall be cognizable in a suit brought under paragraph (1)(B)
> of this subsection–
>
> . . . .
>
> (B) if the amount in controversy is less than the sum or value of $50,000
> (exclusive of interests and costs) computed on the basis of all claims to be
> determined in this suit. . . .

15 U.S.C. § 2310(d).  Under 15 U.S.C. § 2310(d)(3)(B), "[t]he amount in controversy . . . does

not include damages flowing from any pendent state law claim brought by a plaintiff."  *Ansari v.*

*Bella Automotive Group, Inc.*, 145 F.3d 1270, 1272 (11th Cir. 1998).

The first issue before the court is not whether the plaintiff will ultimately be successful on

either MMWA claim, but whether the plaintiff has stated a federal question under the Act in the complaint. The former Fifth Circuit Court of Appeals in *Sisk v. Texas Parks and Wildlife Department*, 644 F.2d 1056, 1058 (5th Cir. 1981), stated, "The applicable test for determining jurisdiction on the face of the pleadings is not whether the plaintiff could actually recover, but whether the federal claim alleged is so patently without merit as to justify the District Court's dismissal for want of jurisdiction." *See also Duke Power Company v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 70, 98 S. Ct. 2620, 57 L. Ed. 2d 595 (1978).

A review of the complaint demonstrates that the plaintiff alleges that the defendants "expressly and impliedly warranted that the mobile home was manufactured in a good and workmanlike manner and complied with appropriate HUD, industry and other governmental standards." (Doc. 1, ¶ 23). It further alleges that the "[d]efendants expressly and implied [sic] warranted that they would repair any defects in the home for a period following the date of the sale." (*Id.*, ¶ 24). Lastly, it alleges that "the defendants impliedly warranted that the mobile home was habitable." (*Id.*, ¶ 32). The plaintiff also enumerates various factual allegations in support of his claims. Under the circumstances, the court cannot conclude that the claims are "so patently without merit" as to justify dismissal.

To the extent that the defendant also asserts that the plaintiff has failed to allege the requisite amount in controversy, the court again must examine the complaint. The plaintiff alleges that he was injured and damaged in that he lost "the value of the mobile home," "[h]e lost time from work in efforts to have the defects cured," "[h]e has been frustrated and aggravated," he "suffered mental anguish," and he "has suffered other injury and damage." (Doc. 1, ¶ 26). Premised on these allegations, the plaintiff requests a judgment "in a sum that exceeds the

10

jurisdictional requirements." (*Id.*, p. 9).

In Alabama, the general rule is that mental anguish is not a recoverable element of damages arising from breach of contract. *See Ruiz de Molina v. Meritt and Furman Insurance Agency, Inc.*, 207 F.3d 1351, 1359 (11th Cir. 2000), *citing Vincent v. Blue Cross-Blue Shield, Inc.*, 373 So. 2d 1054, 1056 (Ala. 1979); *Volkswagen of America, Inc. v. Dillard*, 579 So. 2d 1301, 1303 (Ala. 1991). Alabama recognizes an exception to the general rule, however, which permits the recovery of damages for mental anguish as compensation when a "contractual duty or obligation is so coupled with matters of mental concern or solicitude, or with feelings of a party to whom the duty is owed, that a breach of the duty will necessarily or reasonably result in mental anguish or suffering." *Ruiz de Molina,* 207 F.3d at 1359, *citing Liberty Homes, Inc. v. Epperson*, 581 So. 2d 449, 454 (Ala. 1991); *see also Orkin Exterminating Company, Inc. v. Donovan*, 519 So. 2d 1330 (Ala. 1998). Damages for mental anguish under Alabama law are principally recoverable in actions based on contracts for the repair or construction of a house or dwelling or the delivery of utilities thereto, where the breach affects habitability. *See Ruiz de Molina*, 207 F.3d at 1359 (stating that "In Alabama, '[i]t is settled that the law in this state does not permit recovery for personal injury, inconvenience, annoyance or mental anguish and suffering in an action for breach of a contract of insurance,'" quoting *Vincent*, 373 So. 2d at 1056); *Lawler Mobile Homes, Inc. v. Tarver*, 492 So. 2d 297 (Ala. 1986) (claim for mental anguish properly submitted to the jury on a breach of contract claim involving the purchase of a mobile home); *B & M Homes, Inc. v. Hogan*, 376 So. 2d 657, 671-72 (Ala. 1979) (replacement of a roof). In *Liberty Homes, Inc. v. Epperson*, the Alabama Supreme Court held that the MMWA, which provides for the recovery of damages as to consumer goods, applies to mobile

11

homes. *Liberty Homes, Inc.,* 581 So. 2d at 453, *citing Brigadier Homes, Inc. v. Thompson*, 551 So. 2d 1031 (Ala. 1989).

Although not cited by either party, the Fifth Circuit has held in *Bolens v. Redman Homes, Inc.,* 748 F.2d 1058 (5th Cir. 1984), that the MMWA does not permit the recovery of damages for "personal injury" unless there is alleged to have been a violation of the substantive provisions of § 2308 or § 2304 of the Act. The Fifth Circuit concluded that § 2311(b)(2) sets up a dichotomy between personal injury claims based on the breach of the substantive provisions of § 2308 and § 2304, which are cognizable under the MMWA, and personal injury claims based only on a breach of warranty which "are *not* cognizable under the MMWA ." *Bolens*, 748 F.2d at 1066 (emphasis in the original). In *Oliver v. Homes of Legend*, 2000 WL 1092130 (M.D. Ala. 2000), United States Magistrate Judge Susan Walker cited *Bolens* for the proposition that resorting to state law to determine the availability of such damages is inappropriate because the MMWA contains an express provision regarding recovery of personal injury damages. Judge Walker concluded that it is irrelevant whether or not a breach of warranty claim under the MMWA has resulted in mental anguish because under *Bolens* the Act itself precludes such recovery. *Oliver*, 2000 WL 1092130, *2 & n.6.

Alabama includes "mental anguish" as a subclass of personal injury in actions such as this. There is no Eleventh Circuit authority adopting or even analyzing the Fifth Circuit's construction of the MMWA damages provisions as provided in *Bolens*. In the absence of such authority, and in light of the construction under Alabama law outlined above, that the MMWA may authorize the recovery of such damages, and the Eleventh Circuit's general instruction that federal courts must look to the state law for an assessment of compensable injury, the parties

have sufficiently invoked the jurisdiction of this court under the MMWA by alleging, *inter alia*, mental anguish damages in excess of the jurisdictional amount.

The parties also disagree over whether the home purchased by the plaintiff is a "consumer product" as that term is defined in the MMWA. 15 U.S.C. § 2301(1). The Act provides:

> The term "consumer product" means any tangible personal property which is distributed in commerce and which is normally used for personal, family, or household purposes (including any such property intended to be attached to or installed in any real property without regard to whether it is so attached or installed).

15 U.S.C. § 2301(1). The regulations interpreting the MMWA state that any ambiguity about whether a product is covered under the Act should be "resolved in favor of coverage." 16 C.F.R. § 700.1(a).

The retail sales agreement executed by the plaintiff and Grand Housing at the time of the sale specifically provides under the "Ownership and Duties Toward Property" section that the home "will remain personal property until this Contract is paid in full. Unless we give you prior written consent you will not allow the Manufactured Home to become a part of real estate or to otherwise lose its treatment as personal property under applicable law." (Doc. 9, Ex. A, p. 3, ¶ E). In view of the broad scope intended under the Act, this court finds that although a stationary dwelling is outside the definition "consumer good" because it is "real property," the manufactured home in this case falls within the definition of "tangible personal property" even though it ultimately was attached to real property. 15 U.S.C. § 2301(1). This finding is consistent with the decision of the Alabama Supreme Court in *Epperson*, finding that the Act does apply to manufactured homes. *Epperson*, 581 So. 2d at 453. This is particularly appropriate in this matter since the disputes surrounding the sale and manufacture of the home

manifested themselves even before the home apparently was attached to the land.[2]

## III. THE FAA

The next question the court must address is the applicability of the FAA to the present circumstances.

### A. Structure

The FAA establishes a "federal policy favoring arbitration." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983). It provides that arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA effectively admonishes the federal courts to "rigorously enforce agreements to arbitrate." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221, 105 S. Ct. 1238, 84 L. Ed. 2d 158 (1985). Questions of arbitrability must be addressed with regard to the federal policy favoring arbitration, and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a defense to arbitrability." *Moses H. Cone Memorial Hospital*, 460 U.S. at 24-25. Notwithstanding this strong federal policy, however, ". . . arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit." *AT&T Technologies, Inc. v. Communication*

---

[2] In support of its argument that the home at issue in this case is not a consumer product, the defendant cites the Uniform Commercial Code definition of "consumer goods." *See* ALABAMA CODE § 7-9-109. Because "consumer products" are specifically defined under the MMWA, the court does not deem it necessary to turn to the UCC definition for analogies. The court has also considered the defendant's argument that there are few differences between manufactured homes and "stick-built" homes," but finds this argument unavailing. The facts of this case demonstrate sufficient differences to warrant separate consideration. By way of example, the plaintiff's daughter viewed the intended home on a sales lot, similar to the viewing of other consumer products. Additionally, as already noted, the difficulties arose even before the home was attached to the land.

*Workers of Am.*, 475 U.S. 643, 648, 106 S. Ct. 1415, 89 L. Ed. 2d 648 (1986). As a general rule, therefore, "the party's intentions control, but those intentions are generously construed as to issues of arbitrability." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626, 105 S. Ct. 3346, 87 L. Ed. 2d 444 (1985). Whether an arbitration provision is enforceable, as opposed to the merits of the underlying dispute, is a question for the court. *Dean Witter*, 470 U.S. at 218.

Although the FAA does not create independent federal question jurisdiction (*Moses H. Cone Memorial Hospital*, 460 U.S. at 25 n.32), it does create a body of federal substantive law which establishes and regulates the duty to honor an agreement to arbitrate. The FAA explicitly requires that the arbitration provision be written, and that it evidence a "transaction involving commerce." 9 U.S.C. § 2. Section 3 of the Act provides for a stay of federal proceedings when an issue in the matter is referable to arbitration. 9 U.S.C. § 3. Section 4 provides the court with the authority to issue orders compelling arbitration when one party has failed, neglected, or refused to comply with an arbitration agreement. 9 U.S.C. § 4. Further, state law that conflicts with the FAA is preempted under the Federal Constitution's supremacy clause. U.S. Const. art. VI, clause 2; *Perry v. Thomas*, 482 U.S. 483, 107 S. Ct. 2520, 96 L. Ed. 2d 426 (1987).

**B. Discussion**

Grand Housing alleges the Act mandates that the arbitration agreement be enforced in this case because it is written and involves interstate commerce. The plaintiff does not dispute that there are agreements to arbitrate, that they are written, that they were signed by him, and initially he did not dispute that the applicable transaction involves interstate commerce. Instead, he argues that he should not be compelled to arbitrate his claims against Grand Housing because

15

the arbitration provisions violate the Seventh Amendment right to a trial by jury; the MMWA is a "statutory barrier to mandatory, binding arbitration;" the agreements herein do not provide the necessary minimum guarantees to satisfy the MMWA, and therefore, the agreements are unconscionable; and the agreements lack the necessary clarity, and therefore, are unconscionable. (Doc. 15, pp. 3-18).  The defendant replies that the FAA is not an unconstitutional denial of the right to trial by jury; the MMWA does not prevent binding arbitration in this case; the decision in *Randolph v. Green Tree Financial Corp.*, 178 F.3d 1149 (11th Cir. 1999), does not preclude arbitration; and the agreement is not unconscionable. (Doc. 19, pp. 1-9).  In the plaintiff's reply to Grand Housing's supplemental brief in support of the motion to compel, he asserts that the contract in this matter does not significantly impact interstate commerce, thus defeating this court's jurisdiction. (Doc. 25, p. 9).  The defendant asserts that the contract does evidence a transaction affecting interstate commerce. (Doc. 24, p. 12).

### 1. Interstate Commerce

Relying on *Sisters of the Visitation v. Cochran Plastering Company, Inc.*, ___ So. 2d ___, 2000 WL 264243 (Ala. 2000), the plaintiff asserts that in this case there is insufficient evidence of a "SUBSTANTIAL affect on interstate commerce." (Doc. 25, p. 9)(emphasis in original).  In *Sisters of the Visitation*, the Alabama Supreme Court stated:

> The United States Supreme Court, as previously noted, held in *Terminix, supra*, that, to be subject to the FAA, a contract must relate to a transaction that in fact involves interstate commerce, even if the parties, when they entered the contract, did not contemplate the involvement with interstate commerce. 513 U.S. at 281, 115 S. Ct. 834. Because it is the Sisters who seek to compel arbitration, they have the burden of proving that the transaction in this case affected interstate commerce. *See Transouth Fin. Corp. v. Bell*, 739 So. 2d 1110, 1114 (Ala. 1999).

*Sisters of the Visitation*, 2000 WL 264243, *7.

16

.

In the present litigation, the record demonstrates that the home was manufactured by

Legend in Boaz, Alabama. (Doc. 24, Ex. B, ¶¶ 2-3). The materials used to build it were

transported across state lines. (*Id.*, ¶ 3). The manufactured housing industry is regulated by the

National Manufactured Housing Construction and Safety Standards Act of 1974 (45 U.S.C. §§

5401, *et seq.*), as well as by various state and federal regulations concerning the construction and

safety requirements of the homes. *See* 24 C.F.R. §§ 3282, *et seq.*; ALABAMA CODE §§ 24-6-1, *et*

*seq.* & 24-5-1, *et seq.*).

Because of the plaintiff's reliance on *Sisters of the Visitation*, the court will examine its

application in detail. The facts were as follows:

> The Sisters of the Visitation (hereinafter usually "the Sisters") appeal from
> the trial court's order enjoining the arbitration proceeding initiated by the Sisters
> in a dispute with Cochran Plastering Company, Inc. (hereinafter "Cochran"). The
> Sisters of the Visitation is a Catholic religious order that owns and operates a
> monastery and spiritual retreat in Mobile. The Sisters began a restoration project
> to repair and restore the chapel at the Visitation Monastery. The Sisters engaged
> the services of Hall Baumhauer Architects, P.C., an Alabama company, and
> entered into contracts directly with contractors, from Alabama and several other
> states, within specific trades included in the scope of work for the project.

> The Sisters entered into a contract with Cochran, an Alabama company,
> for Cochran to repair cracks in the plaster in the ceilings and wall of the chapel, to
> cast and install plaster moldings, and to pin up all loose moldings with screws and
> washers. This contract included an arbitration provision, pursuant to which the
> Sisters filed a demand for arbitration; in the demand for arbitration, the Sisters
> claimed that Cochran had negligently damaged decorative paintings on the surface
> of the chapel ceilings and wall and that Cochran had failed to complete its work.
> The Sisters claimed a total of $525,000 for restoration of paintings they claimed
> Cochran had damaged and $50,000 for the completion of the repair work.

> Cochran filed an action in the circuit court for an injunction to stop the
> arbitration proceeding, claiming that the arbitration provision is unenforceable,
> pursuant to Ala. Code 1975, § 8-1-41(3), because, it argues, the contract between
> it and the Sisters did not involve interstate commerce. Cochran further contends
> that the Sisters' claims are precluded by the clause in the arbitration provision that

specifically exempts from arbitration claims relating to "aesthetic effect."

> The issues raised on appeal are: (1) whether the arbitration clause in the contract between the Sisters and Cochran is made enforceable by the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq., and (2) whether the claims made by the Sisters against Cochran constitute claims relating to "aesthetic effect," which are expressly excluded from the operation of the arbitration clause. Because we affirm the trial court's order enjoining the arbitration proceedings, we do not reach the second issue, concerning the scope of the arbitration agreement.

*Sisters of the Visitation*, 2000 WL 264243, *1. In determining whether the transaction involved interstate commerce, the court examined, the citizenship of the parties; where the tools and equipment for the project were purchased; what portion of the services and materials were obtained out of state; the fact that there would be no subsequent movement of the product across state lines; and the degree of separability from other contracts that have a substantial effect on interstate commerce.   The court held that the agreement therein was not subject to arbitration under the FAA.

Subsequent to the *Sisters of the Visitation*, the Alabama Supreme Court in *Ex parte Stewart*, ___ So. 2d ___, 2000 WL 1367608 (Ala. 2000), was presented with the question of whether a distribution agreement between the Birmingham News and local distributors, which included an arbitration agreement, satisfied the interstate commerce requirement under the FAA. The trial court held that it did, and the plaintiffs' sought writs of mandamus from the Alabama Supreme Court directing the trial court to vacate its arbitration order. *Id.*, 2000 WL 1367608, *3. The trial record demonstrated that "[v]irtually all of the inserts that are included as part of The Birmingham News, such as Sunday comics, Parade magazine, React magazine, and advertising inserts for national retail chains such as Rich's, Sears, and others, are prepared, printed, and shipped to The News from companies located outside the State of Alabama" and that "[t]he

News also obtains a significant portion of its news content and photographs from outside the State, under agreements with news services such as The Associated Press, Universal Press, Knight Ridder Tribune, and King Features." *Id*. The plaintiffs did not dispute this. The Court found that the distribution agreement required the plaintiffs to distribute the advertising inserts as part of the complete newspaper and that they "were prepared, printed, and shipped to The News in interstate commerce, and news content, designated as part of the complete newspaper by The News, that was obtained by The News in interstate commerce." *Id*. The petitions for the writ of mandamus were denied, with the Court finding that "[t]he trial court properly directed arbitration pursuant to the arbitration clauses in the Agreement because the plaintiffs were integral and inseparable parts of the flow of interstate commerce." *Id*., *4-5.

The applicability of the FAA must be determined on a case by case basis. In *Allied-Bruce Terminix Companies, Inc. v. Dobson*, 513 U.S. 265, 115 S. Ct. 834, 130 L. Ed. 2d 753 (1995), the Supreme Court stated: "[T]his Court has previously described the Act's reach expansively as coinciding with that of the Commerce Clause." *Id*. at 274. In *United States v. Lopez*, 514 U.S. 549, 115 S. Ct. 1624, 131 L. Ed. 2d 626 (1995), the Supreme Court stated that for an activity to be subject to Congressional regulation under the Commerce Clause, the activity must "substantially affect" interstate commerce. *Id*. at 559.

Examining the record, the court is satisfied that there is sufficient contact with interstate commerce to warrant application of the FAA. Although merely reciting in the agreement that the transaction involves interstate commerce is insufficient to invoke the FAA (*See Rogers Foundation Repair, Inc. v. Powell*, 748 So. 2d 869, 872 (Ala. 1999)), it certainly is a starting point. The agreement herein does state that the home sold in this matter "is a product

19

manufactured and sold in interstate commerce and that the provisions of the Federal Arbitration

Act are applicable to this contract. The parties further acknowledge that the sale of said mobile

home is a transaction in interstate commerce." (Doc. 15, Ex. B, p. 1). The record, specifically

Brown's affidavit, further demonstrates that the home was manufactured by Legend in Boaz,

Alabama (doc. 24, ex. B, ¶¶ 2-3), that the materials used to build it were transported across state

lines (*id.*, ¶ 3); and that the manufactured housing industry is regulated by state and federal

authorities. The plaintiff has offered nothing disputing the fact that the materials used to produce

the home were transported from points outside the state of Alabama. Under the present

circumstances, the court finds that the FAA is applicable.

### 2. Seventh Amendment

In *Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 961 F.2d 1148, 1155 n.12 (5th

Cir. 1992), *cert. denied,* 506 U.S. 1079 (1993), the court stated that the "Seventh Amendment

does not preclude 'waiver' of the right to jury trial through the signing of a valid arbitration

agreement." This is consistent with Congress' intent in enacting the FAA to "declare a national

policy favoring arbitration and withdraw[ing] the power of the states to require a judicial forum

for the resolution of claims which the contracting parties agree to resolve by arbitration."

*Southland Corp. v. Keating,* 465 U.S. 1, 10, 104 S. Ct. 852, 79 L. Ed. 2d 1 (1984). It is also

consistent with the Supreme Court's approval of various procedural devices, such as summary

judgment, the directed verdict and setting aside a verdict, which "have been found not to be

inconsistent with the Seventh Amendment." *Parklane Hosiery Co.v. Shore*, 439 U.S. 322, 336,

99 S. Ct. 645, 58 L. Ed. 2d 552 (1979). The statutory framework of the FAA and the Supreme

Court's interpretation of it cannot be contorted into a conclusion that they result in an unlawful

deprivation of the plaintiff's constitutionally protected right to a jury trial.[3]

### 3. The MMWA

The plaintiff next asserts that the MMWA is a statutory barrier to mandatory, binding arbitration. Specifically, he states, "If one were to analyze the legislative history of the Federal Arbitration Act and Magnuson-Moss they would clearly come away with the opinion that the FAA was not intended to be imposed against consumers. If this were to be the case, then Magnuson-Moss would not guarantee an individual the right to commence a civil action 'for damages' as a remedy. . . ." (Doc. 15, p. 9). This argument is not novel. United States District Judge Myron H. Thompson held in *Wilson v. Waverlee Homes, Inc.,* 954 F. Supp. 1530, 1537 (M.D. Ala. 1997), that binding arbitration clauses conflict with the MMWA and are unenforceable. He reached this conclusion following his review of the legislative history of the Act, finding that § 2310(a)(3), which provides for "informal dispute settlement procedures or mechanisms," were intended to act as a prerequisite to the filing of a MMWA action but not a bar to such litigation. *Wilson,* 954 F. Supp. at 1537; 15 U.S.C. § 2310(a)(3). Judge Thompson

---

[3] *See also Stinson v. America's Home Place, Inc.,* 108 F. Supp. 2d 1278, 1286 (M.D. Ala. 2000) ("'In order to demonstrate that his seventh-amendment rights were violated, a plaintiff must show that the arbitration clause itself is unconscionable, such that 'the arbitrator cannot hear his claims against [the defendants], or cannot award the full panoply of relief available in state courts under Alabama law.' *Goodwin v. Ford Motor Credit Co.,* 970 F. Supp. 1007, 1015 (M.D. Ala. 1997) (Thompson, J.). Absent such a showing, federal arbitration policy, as announced by the Supreme Court in *Allied-Bruce* [*Terminix Co., Inc. v. Dobson,* 513 U.S. 265, 115 S. Ct. 834, 130 L. Ed. 2d 753 (1995)], requires the court to presume that, by signing the agreement, [the plaintiff] knowingly and intelligently waived his right to a jury trial. 513 U.S. at 280-82, 115 S. Ct. 834."); *Bank One, N.A. v. Coates,* 125 F. Supp. 2d 819, 834, 2001 WL 12866, *14 (S.D. Miss. January 2, 2001) ("The Seventh Amendment does not confer the right to a trial, but only the right to have a jury hear the case once it is determined that the litigation should proceed before a court. If the claims are properly before an arbitral forum pursuant to an arbitration agreement, the jury trial right vanishes . . . . (quoting *Cremin v. Merrill Lynch Pierce Fenner & Smith, Inc.,* 957 F. Supp. 1460, 1471 (N.D. Ill. 1997)); *see also Bosinger v. Phillips Plastics Corp.,* 57 F. Supp. 2d 986, 991 (S.D. Cal. 1999) ("clear and unmistakable" standard not applicable to an individual's waiver of his or her own rights) (citing *Wright v. Universal Maritime Servs.,* 525 U.S. 70, 119 S. Ct. 391, 396, 142 L. Ed. 2d 361 (1998)); *Parsley v. Terminix Intern. Co.,* 1998 WL 1572764, *5 ("The 'loss of the right to a jury trial is a necessary and fairly obvious consequence of the agreement to arbitrate.'") (citation omitted); *Burlington Northern R.R. Co. v. Soo Line R.R. Co.,* 162 B.R. 207, 214 (D. Minn. 1993) (noting that "[i]f the Defendants were correct that a party's constitutional right to a trial by jury] presented a serious limitation on the duty to arbitrate, arbitration provisions would have to be narrowly construed.").

further concluded that the congressional expression that informal dispute resolution should not

be a bar to an MMWA action further expressed the intent of Congress to prohibit a contractual

arbitration agreement. He also cited the history of regulations adopted by the Federal Trade

Commission as further evidence of the regulators' intent to prohibit binding arbitration

agreements. This interpretation has been adopted by Senior United States District Court Judge

William M. Acker, Jr., in *Mungall v. Homes of Legend, Inc., et al.*, CV 99-AR-2987-M

(December 30, 1999), p. 2,[4] citing *Abramson v. Roberts*, CV 99-AR-2910-S (December 7, 1999).

Contrary to the foregoing, United States Magistrate Judge Paul W. Greene has held that

the MMWA does not preclude binding arbitration. In so holding, Judge Greene stated:

> A reading of the statutory language in the MMWA reveals only that
> Congress intended to establish a feasible and alternative dispute process as a
> prerequisite to a MMWA lawsuit. This congressional intent is not readily
> distinguishable from the congressional intent expressed in Title VII that a pre-
> litigation review process be developed in employment discrimination cases. The
> law of the Eleventh Circuit is unequivocal that statutory claims including
> employment discrimination claims are subject to waiver by contract in favor of
> binding arbitration. *See e.g. Bender v. A. G. Edwards & Sons, Inc.*, 971 F.2d 698
> (11th Cir. 1992). The MMWA contains no expression of a greater congressional
> concern related to consumer products than employment discrimination as a matter
> of public policy. The citation to the regulations and the history of those
> regulations is equally limited in illuminating congressional or administrative
> intent. It is true that the regulators concluded that the statutory prerequisite
> contained within the Act did not clearly indicate that Congress intended such a
> procedure to substitute for the filing of a lawsuit under the provisions of the Act
> itself. This conclusion is unremarkable. The conclusion says nothing about the
> ability of the parties to reach by contract an agreement to arbitrate a dispute. The
> regulators merely quite prudently concluded that the congressional reference to
> informal dispute processes did not reflect an intent to create a <u>mandatory</u> non-
> judicial solution to a dispute. The regulations say nothing about the parties'
> ability to contract between themselves as to the settlement of issues in dispute.
> *See* the dissenting opinion of Justice Harold See of the Alabama Supreme Court in

---

[4] The opinion is located in the file at document 15, exhibit F.

> *Southern Energy Homes, Inc. v. Lee,* 732 So. 2d 994, 1003 (1999), adopted as the
> law of Alabama in *Southern Energy Homes v. Ard*, [772] So. 2d [1131] (Ala.
> 2000)(not yet released for publication as of 9/29/2000).  Ultimately the question is
> not whether arbitration of MMWA claims is a good or bad public policy with
> regard to consumer goods or mobile homes but whether this court may ignore
> clear congressional and Eleventh Circuit mandates that such a policy is strongly
> favored.  *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 107 S. Ct.
> 2332, 96 L. Ed. 2d 185 (1987).  Nothing in the MMWA bans arbitration.

*Collins v. Fleetwood Homes, Inc., et al.*, CV 00-PWG-0521-M, pp. 9-10 (October 2000)

(emphasis in original).  *Accord Harold Allen's Mobile Home Factory Outlet, Inc. v. Early*, ___

So. 2d ___, 2000 WL 869579, *5 (Ala. June 30, 2000).

     This court respectfully disagrees with Judge Thompson and hereby adopts the reasoning

of Judge Greene.  Accordingly, the court finds that this claim is without merit.

### 4. Unconscionability

     The plaintiff states that "[i]t is clear from the face of the contract upon which [the]

defendant's motion is based that the contract is blatantly unconscionable." (Doc. 7, p. 1). The

defendant claims that the contract is not unconscionable.

      When considering whether an arbitration clause in a contract is valid, the court may

inquire only into "those issues relating to the making and performance" of the arbitration clause

itself and not into claims regarding the enforceability of the contract in general.  *Prima Paint

Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404, 87 S. Ct. 1801, 1806, 18 L. Ed. 1270

(1967).  There must be evidence that the arbitration clause, standing apart from the whole

agreement, is not enforceable.  *See Coleman v. Prudential Bache Securities, Inc.*, 802 F.2d 1350,

1352 (11th Cir. 1986).  *See also Anniston Lincoln Mercury Dodge v. Corner*, 720 So. 2d 898

(Ala. 1998) (Challenge to entire contract is to be decided by arbitrator).  Allegations of

unconscionability in the contract as a whole are matters to be resolved in arbitration. *Coleman,* 802 F.2d at 1352; *Miller v. Drexel Burnham Lambert, Inc.*, 791 F.2d 850, 854 (11th Cir. 1986). *See also Chastain v. The Robinson-Humphrey Co.*, 957 F.2d 851, 854 (11th Cir. 1992) ("Under normal circumstances, an arbitration provision within a contract admittedly signed by the contractual parties is sufficient to require the district court to send any controversies to arbitration. . . . Under such circumstances, the parties have at least presumptively agreed to arbitrate any disputes, including those disputes about the validity of the contract in general. . . . Because the making of the arbitration agreement itself is rarely in issue when the parties have signed a contract containing an arbitration provision, the district court usually must compel arbitration immediately after one of the contractual parties so requests." (footnote and citations omitted)).

As noted by Judge Thompson in *Rollins, Inc. v. Foster*, 991 F. Supp. 1426, 1431 (M.D. Ala. 1998):

> . . . § 2 of the FAA prohibits the enforcement of an arbitration clause that is invalid "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C.A. § 2. In construing this section, the Supreme Court has stated that it "gives States [ ] method[s] for protecting consumers against unfair pressure to agree to a contract with an unwarranted arbitration provision." *Allied-Bruce Terminix v. Dobson*, 513 U.S. 265, 280-82, 115 S. Ct. 834, 843, 130 L. Ed. 2d 753 (1995). It is a cardinal principle of federal arbitration law that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 648, 106 S. Ct. 1415, 1418, 89 L. Ed. 2d 648 (1986) (quoting *United Steelworkers v. Warrior & Gulf Navig. Co.*, 363 U.S. 574, 583-84, 80 S. Ct. 1347, 1353, 4 L. Ed. 2d 1409 (1960)).
>
> However, the Supreme Court held in *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-04, 87 S. Ct. 1801, 1806, 18 L. Ed. 2d 1270 (1967), that, while a party cannot be required to submit to arbitration any dispute

which he has not agreed so to submit, § 4 permits a federal court to hear only claims involving fraud in the inducement of the arbitration clause itself and not claims of fraud in the inducement of the contract as a whole or generally; *Prima Paint's* mandate is that challenges to the validity of the contract as a whole must be presented to the arbitrator. "Courts consistently have . . . held that issues relating to the making and performance of a contract as a whole, not specific to the arbitration clause or agreement, should be heard by the arbitrator." *Rainbow Investments, Inc. v. Super 8 Motels, Inc.*, 973 F. Supp. 1387, 1389 (M.D. Ala. 1997) (Thompson, J.)

While *Prima Paint* dealt only with the validity of a contract in light of fraudulent inducement claims, the same principal applies to other challenges to an arbitration clause, such as those based on allegations of forgery, mutual mistake, unconscionability, and impossibility. *See, e.g., Coleman v. Prudential Bache Sec., Inc.*, 802 F.2d 1350, 1352 (11th Cir. 1986) ("Claims alleging unconscionability, coercion, or confusion in signing the agreement generally should be determined by an arbitrator because those issues go to the formation of the entire contract rather than to the issue of misrepresentation in the signing of the arbitration agreement.") (citations omitted); *see also Benoay v. Prudential-Bache Sec., Inc.*, 805 F.2d 1437, 1441 (11th Cir. 1986); *Miller v. Drexel Burnham Lambert, Inc.*, 791 F.2d 850, 854 (11th Cir. 1986). Thus, § 4 permits a federal court to hear only claims involving forgery, mutual mistake, unconscionability, and impossibility as to the arbitration clause itself and not claims of forgery, mutual mistake, unconscionability, and impossibility as to the contract as a whole or generally.

Judge Thompson also recently stated:

Alabama law does not have an explicit standard for determining unconscionability. *See Roberson v. Money Tree of Alabama*, 954 F. Supp. 1519, 1524 n.7 (M.D. Ala. 1997) (Thompson, J.) (discussing the "definitional haziness" in Alabama law and in the Uniform Commercial Code). Rather, Alabama courts use the following four factors to determine whether a contract or contract provision is unconscionable: (1) whether there is an absence of meaningful choice on one party's part; (2) whether the contractual terms are unreasonably favorable to one party; (3) whether there was unequal bargaining power among the parties; and (4) whether there were oppressive, one-sided, or patently unfair terms in the contract. *See Layne v. Garner*, 612 So. 2d 404, 408 (Ala. 1992) (citing *Wilson v. World Omni Leasing, Inc.*, 540 So. 2d 713, 717 (Ala. 1989); *Lloyd v. Service Corp.*, 453 So. 2d 735, 739 (Ala. 1984); *Cresting Center v. Hinton*, 567 So. 2d 393 (Ala. Civ. App. 1990); *Advertiser Co. v. Electronic Engineers*, 527 So. 2d 1317 (Ala. Civ. App. 1988)). In addition, Alabama courts recognize that the rescission of a contract or portion of a contract "is an extraordinary remedy

usually reserved for the protection of the unsophisticated and uneducated."
*Marshall v. Mercury Finance Co.*, 550 So. 2d 1026, 1028 (Ala. Civ. App. 1989)
(quoting *E & W Building Material Co. v. American Savings & Loan Ass'n*, 648 F.
Supp. 289, 291 (M.D. Ala. 1986)).

The Alabama Supreme Court has also defined an unconscionable contract
as one "'such as no man in his sense and not under delusion would make on the
one hand, and as no honest and fair man would accept on the other.'" *Layne*, 612
So. 2d at 408 (quoting *Hume v. United States*, 132 U.S. 406, 10 S. Ct. 134, 33 L.
Ed. 393 (1889)). Stating the standard in this manner may be overly exacting, and
thus impossible of proof. Yet, at a minimum, a party cannot rely on an abstract
principle or theory of unfairness of a bargain to make a case for
unconscionability; it must still be gauged by the actual circumstances of the case,
and not in the abstract. . . .

*Stinson v. America's Home Place, Inc.*, 108 F. Supp. 2d 1278, 1285-86 (M.D. Ala. 2000). The

party claiming unconscionability bears the burden of proof. *American General Finance, Inc. v.*

*Branch*, ___So. 2d ___, 2000 WL 1868516 (Ala. 2000); *ex parte Napier*, 723 So. 2d 49 (Ala.

1998). Additionally, Alabama law is clear that a party is presumed to understand an agreement

voluntarily signed. *Patrick Home Centers, Inc. v. Carr*, 730 So. 2d 1171, 1174 (Ala. 1999). *See*

*also Green Tree Agency, Inc. v. White*, 719 So. 2d 1179, 1180 (Ala. 1998) ("'[O]rdinarily when a

competent adult, having the ability to read and understand an instrument, signs a contract, he will

be held to be on notice of all the provisions contained in that contract and will be bound thereby.'

*Power Equipment Co. v. First Alabama Bank*, 585 So. 2d 1291, 1296 (Ala. 1991)"). The

Alabama Supreme Court has recently stated:

Melvin [Holt] argues that his illiteracy and his wife's semiliteracy should render
the arbitration agreement invalid; this argument is without merit. In *Nissan, Inc.*
*v. Foster*, [Ms. 1982183, June 23, 2000] --- So. 2d --- (Ala. 2000), this Court
addressed a similar argument:

Foster argues that he should be relieved of this contractual
obligation because he has only a sixth-grade reading level.
However, this rule has long been established in Alabama:

26

"'[A] person who signs an instrument without reading it, when he can read, can not, in the absence of fraud, deceit or misrepresentation, avoid the effect of his signature, because [he is] not informed of its contents; and the same rule [applies] to one who can not read, if he neglects to have it read, or to enquire as to its contents.' *Beck & Pauli Lithographing Co. v. Houppert and Worcester*, 104 Ala. 503, 506, 16 So. 522, 522 (1894) (emphasis added [in *Mitchell Nissan*]). *Accord Gaskin v. Stumm Handel GmbH*, 390 F. Supp. 361, 366 (S.D.N.Y. 1975) ('"If the signer could read the instrument, not to have read it was gross negligence; if he could not read it, not to procure it to be read was equally negligent; in either case the writing binds him."'). Foster was aware that he was signing a contract to purchase the automobile, and he does not allege that his signature was procured by fraud, deceit, or misrepresentation. Although Foster was aware of his limited reading ability, he did not ask his relatives who had accompanied him, or a representative of Mitchell Nissan, to read the agreement to him. Moreover, Foster did not tell a representative of Mitchell Nissan that he was unable to read or to understand any portion of the contract. Accordingly, Foster cannot avoid his contractual obligation by now asserting that he could not read the contract or understand it. *See id.*" . . .

Similarly, Melvin cannot avoid enforcement of the arbitration provision merely on the basis that he could not read what he was signing.

*Johnnie's Homes, Inc. v. Holt*, ___ So. 2d ___, 2001 WL 29263, *4-5 (Ala. 2001).

The plaintiff herein states that he has a fifth grade education and that he does not understand legal phrases and terms, such as arbitration. (Doc. 15, Ex. A, ¶ 9). He also states that he is not a lawyer and he has no legal experience. (*Id.*). He further states that he was not told

that the documents he was signing contained arbitration clauses and if he had been told he "would not have knowingly, willingly, and voluntarily signed any document containing one of those clauses." (*Id.*, ¶¶ 10, 12). The evidence before the court is insufficient to warrant a conclusion that unconscionability precludes enforcement of the arbitration provisions. The plaintiff has failed specifically to demonstrate unconscionability concerning the arbitration provisions.

First, there is no evidence that the plaintiff lacked a meaningful choice. For instance, there is nothing to suggest that he could not have obtained financing elsewhere. Additionally, he did not ask any questions concerning whether or not he had to execute the arbitration agreement with Grand Housing at the time of the sale. Still further, there is no evidence he was coerced or compelled to sign the arbitration agreement. Second, the terms of the agreement are not unreasonably unfavorable to one party. Although the plaintiff asserts in a conclusory fashion that "the oppressive and one-sided terms are patently obvious," this court disagrees. This conclusory statement does not support such a finding.[5] Third, nothing suggests that there was such unequal bargaining power that this court must conclude that the agreement is unenforceable. Fourth, there are no "oppressive, one-sided, or patently unfair terms." To find otherwise would encourage individuals to sign contracts without reading them and to disavow any responsibility for signing.

To the extent the plaintiff asserts that the salesman did not explain the terms of the

---

[5] To the extent the plaintiff asserts that "the owner of Homes of Legend acknowledges that it has on occasion agreed to waive the rules of the AAA but not the procedure" (doc.15, pp. 12-13), the court finds that is not an accurate statement of what was stated. Donald Brown, the owner, stated, "HOL has also, on occasion and upon request of plaintiffs, agreed to waive the applicability of the rules of the American Arbitration Association and enter into another agreement with opposing counsel and other defense counsel to establish a procedure." (Doc. 24, Ex. B, ¶ 9). This statement does not support the plaintiff's argument that he lacked a meaningful choice.

agreement, the court finds that the salesman was not under a duty to explain the arbitration agreement to the plaintiff. *See Harold Allen's Mobile Home Factory Outlet, Inc.,* 2000 WL 869579, \*4 (no general duty to disclose arbitration agreement); *Green Tree Agency v. White*, 719 So. 2d 1179, 1180 (Ala. 1998) (mobile home seller did not have a fiduciary duty to disclose the presence of an arbitration clause). Additionally, in this case, as in *Early*, the arbitration agreement was a separate document, it was clearly identified as an arbitration provision, and specifically included the terms on a single page. (Doc. 9, Ex. B). There is no evidence the salesman prevented the plaintiff from reading the document or prevented the plaintiff from taking the time to review the same. There is no indication the salesman misled the plaintiff as to the terms and conditions stated in the arbitration agreement. There is not even an allegation that the plaintiff asked any questions at the time of the signing. The record is not sufficient to support the plaintiff's request that the motion to compel arbitration be denied on this ground.

### 5. Lack of Clarity

The plaintiff next asserts that the arbitration agreement is not enforceable because it lacks the minimum guarantees to ensure that his ability to vindicate his statutory rights. He relies principally on *Randolph v. Green Tree Financial Corp.*, 178 F.3d 1149 (11th Cir. 1999). In *Randolph*, the arbitration agreement was lengthy, but did not include any reference to the payment of filing fees, arbitrators' costs or what rules would be applicable. The Eleventh Circuit Court of Appeals held that the agreement "fails to provide the minimum guarantees required to ensure that Randolph's ability to vindicate her statutory rights will not be undone by steep filing fees, steep arbitrators' fees, or other high costs of arbitration." *Id.*, 178 F.3d at 1158.

The United States Supreme Court recently reversed in part the decision of the Eleventh

Circuit in *Randolph*, holding that the agreement's failure to mention costs and fees does not make it per se unreasonable. The Supreme Court cited the strong federal policy favoring arbitration underlying the FAA "'to reverse the longstanding judicial hostility to arbitration agreements . . . and to place arbitration agreements on the same footing as other contracts.'" *Green Tree Financial Corp. v. Randolph*, ___U.S.___, 121 S. Ct. 513, 521 (2000), *citing Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24, 111 S. Ct. 1647, 114 L. Ed. 2d 26 (1991). The Court stated that to invalidate the agreement premised on the plaintiff's claim that the absence of any terms on costs and fees creates the "risk" that she will incur prohibitive costs and thereby forces her to abandon her claims is "too speculative to justify the invalidation of an arbitration agreement." *Randolph*, 121 S. Ct. at 522. The Court further stated that "[t]o invalidate the agreement on that basis would undermine the 'liberal federal policy favoring arbitration agreements" (*id.*, *citing Moses H. Cone Memorial Hospital*, 460 U.S. 24, 103 S. Ct. 927) and "[i]t would also conflict with our prior holdings that the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration" (*Randolph*, 121 S. Ct. at 522, *citing Gilmer*, 500 U.S. at 25). Lastly, the Court stated that the determinative questions are (1) "whether the parties agreed to submit their claims to arbitration," and (2) "whether Congress has evidenced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." *Randolph*, 121 S. Ct. at 521.

The agreement Grand Housing seeks to enforce was entered into with the plaintiff on October 30, 1999. It clearly states that the parties (the plaintiff and Grand Housing) intended for any disputes between them be subject to arbitration. (Doc. 12, Ex. B). It further states the

procedures to be followed in resolving the disputes are under the Better Business Bureau Rules.[6]
(*Id.*). A fair reading of the agreement makes it clear that the parties agreed to arbitrate their
disputes, including the present matter. Although the agreement does not specify who will bear
the fees and costs associated with any arbitration and although it also incorrectly states that
arbitration is to be conducted in the "county of sale, that is Jefferson County," these facts are
insufficient to overcome the strong federal policy favoring arbitration. Accordingly, in light of
the Supreme Court's decision in *Randolph*, this court finds that it cannot preclude enforcement of
the agreement of the parties. Additionally, the record before this court is not adequate for the
undersigned to conclude that the agreement is unenforceable premised on any other
considerations. To find otherwise would require the court to engage in speculation, something it
cannot do.

In support of the opposition to the motion to compel arbitration, the plaintiff cites this
court to the holding of Judge Acker in *Mungall* that irreconcilable inconsistencies in arbitration
agreements are sufficient to preclude binding arbitration. *Mungall,* pp. 3-4. In *Mungall,*
defendant Grand Housing sought by motion to compel the plaintiff to binding arbitration. As in
this case, a number of facts were evident: (1) Grand Housing had entered into an "Agreement for
Binding Arbitration;" (2) the agreement provided that any arbitration between Grand Housing
and the plaintiff therein was to be conducted "in accordance with the applicable Rules of the
Better Business Bureau that are in effect;" (3) that the agreement "inures to the benefit of the
manufacturer [Homes of Legend, Inc.];" and (4) another warranty agreement executed by Homes

---

[6] There is no evidence that the plaintiff was provided with a copy of the Better Business Bureau Rules.

of Legend expressly provided that any unresolved controversy between it and the plaintiff were

to be decided by arbitration pursuant to the rules of the American Arbitration Association and not

the Better Business Bureau.  (Doc. 15, Ex. E, p. 3).  Judge Acker denied the defendant's request

to compel arbitration, stating

> *Randolph* stands in the way because [the plaintiff] and this court are faced with
> equivocal and contradictory arbitration provisions.  Arbitration can be a substitute
> for a judicial forum only if it is fair and understandable.  That is not the case here.
> For aught appearing, the cost to [the plaintiff] of obtaining a resolution of his
> claims by arbitration would be considerably more than the cost of resolution in
> this court.  An arbitration clause, in order to pass muster under *Randolph*, must
> provide an exposure to cost by the claimant that is not seriously higher than the
> cost of access to court.

*Id.*, pp. 3-4.  Examining Judge Acker's reasoning, this court must note two items: First, the

landscape has changed since Judge Acker entered his order relying on the Eleventh Circuit's

holding in *Randolph*; second, in this case, the "Agreement for Binding Arbitration" between

Grand Housing and the plaintiff was signed on October 30, 1999, and it is enforceable.  The

limited warranty document signed by Homes of Legend and the plaintiff approximately two

weeks later on October 17, 1999, although in some respects inconsistent with the earlier

agreement, did not alter the agreement between Grand Housing and the plaintiff, especially since

Grand Housing was not a signatory to that second agreement.

After extensive consideration and deliberation, the court finds that when the "Agreement

for Binding Arbitration" was signed by the plaintiff and a representative of Grand Housing on

October 30, 1999, the parties -- the plaintiff and Grand Housing -- clearly agreed to resolve any

disputes between them by binding arbitration.  Although the agreement failed to address the

payment of arbitration fees and costs, that does not nullify the agreement under the present

circumstances.  To the extent the plaintiff claims that he did not know what he was signing or the consequences thereof, the court cannot excuse that conduct.  To the extent the plaintiff claims that the agreement is unenforceable because of the second, conflicting agreement to arbitrate, the court finds otherwise.  Although the second agreement tends to muddle the issues, the later agreement between Homes of Legend and the plaintiff does not vitiate the plaintiff's previous agreement with Grand Housing to arbitrate their disputes.  Accordingly, the plaintiff's challenge on this ground must fail.

## IV.  DISCLOSURE OF THE SETTLEMENT WITH HOMES OF LEGEND

Also before the court are the motion of  Grand Housing seeking an order requiring the plaintiff to disclose the amount paid or to be paid by Homes of Legend (doc. 27) to the plaintiff in settlement of this case and the plaintiff's motion for a protective order preventing the disclosure of the settlement amount (doc. 28).  Upon consideration, the court finds that the defendant may ultimately be entitled to disclosure of the settlement amount, however, the motion is premature.  Accordingly, the motion is denied without prejudice to the defendant's right to seek disclosure of the same at a more appropriate time.  Having denied the defendant's request for this information, the plaintiff's motion for a protective order is moot.

## V.  CONCLUSION

Premised on the foregoing, the court finds that Grand Housing's motion to dismiss the complaint is due to be denied and the motion to compel arbitration (doc. 6) is due to be granted. An order consistent with these findings will be entered.  The arbitration process is to be initiated by Grand Housing and the arbitration is to take place in not more than 120 days from the date of the entry of the order compelling arbitration in this case.  Additionally, the motion of  Homes of

Legend to compel arbitration (doc. 9) is moot; Grand Housing's motion seeking the disclosure of the settlement amount between the plaintiff and Homes of Legend (doc. 27) is due to be denied without prejudice; and the plaintiff's motion for a protective order preventing the disclosure of the settlement amount (doc. 28) is moot.

**DONE,** this the ⁴ᵗʰ day of March, 2001.

JOHN E. OTT
United States Magistrate Judge